Filed 8/18/16  P. v. Brown CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H040734 |
| Plaintiff and Respondent, | (Santa Cruz County Super. Ct. No. F24663) |
| v. | |
| WILLIAM ODESSA BROWN, | |
| Defendant and Appellant. | |

A jury found defendant William Odessa Brown guilty of assault with a deadly weapon.  (Pen. Code, § 245, subd. (a)(1).)[1]  After defense and prosecution waived jury on bifurcated issues, the trial court found true special allegations that defendant had suffered one prior serious felony conviction (§ 667, subds. (a)(1), (b)–(i)) and had served one prior prison term (§ 667.5, subd. (b)).  Defendant argues his trial counsel provided ineffective assistance by not objecting to impeachment evidence of a prior felony conviction that defendant argues did not involve moral turpitude, and by not objecting to unduly prejudicial evidence of defendant's false responses on a job application.  Defendant further contends that the trial court erred by imposing two enhancements based on a single prior prosecution that resulted in two felony convictions.  We will find no prejudicial error affecting defendant's guilt.  However, we will modify defendant's sentence to strike a one-year prior prison term enhancement (§ 667.5, subd. (b)) and affirm the judgment as modified.

---

[1]  Unspecified statutory references are to the Penal Code.

Defendant has also filed two petitions for writ of habeas corpus in propria persona. We dispose of those petitions by separate orders filed this day. (See Cal. Rules of Court, rule 8.387(b)(2)(B).)

## I. TRIAL COURT PROCEEDINGS

Defendant swung a box cutter toward Valente Ramirez's face in April 2013 when they were both working the graveyard shift at a vitamin manufacturer in Scotts Valley. Defendant was charged with one count of assault with a deadly weapon.

### A. TRIAL EVIDENCE

Several eyewitnesses testified at trial.

#### 1. Valente Ramirez

On the night of the incident, then 18-year-old Ramirez was working the graveyard shift, which started at 10:00 p.m. Ramirez was wearing a beard net, a hair net, a face mask, and other mandatory clothing to prevent contamination of the vitamins being produced. Ramirez testified that he had worked at the vitamin manufacturer for a couple months and that one of his jobs was to drain water from equipment into buckets that were the size of garbage cans. He would then wheel the buckets to a wash station and pour out the water.

Ramirez testified that at the beginning of his shift he filled a bucket with water and entered the wash station to pour it out. Ramirez saw defendant washing buckets at the wash station and waited for defendant to finish so that Ramirez could dump his bucket. Defendant noticed Ramirez waiting and told Ramirez "I'll do it, I'll do it for you." Ramirez responded, "Do what you're doing and I'll do my job." According to Ramirez, the two talked to each other in a normal tone of voice for about 30 seconds and then defendant became visibly irritated with Ramirez and walked to an open area inside the building near the wash station.

Ramirez testified that once they were in the open area defendant raised his voice and started asking Ramirez "do you have a problem with me?" Defendant reportedly

2

started hitting his own chest with his hand, which Ramirez perceived as a challenge to fight. Ramirez kept repeating, "Just do your job and I'll do my job." Ramirez testified that he did not want to fight defendant and remained still because he just wanted to do his job. Defendant moved closer to Ramirez, grabbed an orange box cutter from a pocket protector in his suspenders, and swung once with the box cutter toward Ramirez's face. The box cutter's blade was extended almost an inch when defendant swung it and Ramirez felt his face mask move from being touched by the blade. Ramirez testified that he did not move when defendant swung the box cutter because he was not expecting it. After defendant swung the box cutter, two coworkers grabbed Ramirez and took him outside. The incident lasted less than five minutes.

Ramirez testified that he threw away the face mask he had been wearing when he took his lunch break that night because "when it's a break you throw all that stuff away." Later during that shift, Ramirez's manager called him into his office and Ramirez recounted the incident. After that initial meeting with the manager, Ramirez went to the restroom and noticed a little cut on the bottom of his lip. He returned to his manager to show him the cut and his manager took a picture of it, which was admitted into evidence at trial.

### 2. Other Eyewitnesses

Alejandro Nieto testified through an interpreter that he was in the wash station area when the incident occurred. Nieto testified that Ramirez brought a bucket to dump, Ramirez and defendant started talking, and defendant eventually took the bucket from Ramirez and dumped the water. Nieto could not understand what they were saying to each other because he was not a fluent English speaker but believed based on defendant's posturing that defendant was challenging Ramirez to a fight. Nieto testified that defendant's hands were up like a boxer. At some point, defendant swung an orange knife at Ramirez. Ramirez did not move when defendant swung the knife at him.

3

George Soto testified that he was next to Nieto during the incident. Soto heard defendant ask Ramirez "if he want[ed] to go." At some point, Ramirez said something to defendant that Soto did not hear and defendant asked Ramirez if he was threatening him. Defendant moved closer to Ramirez, took out a box cutter, and swiped it at Ramirez's face. Soto testified that the box cutter touched Ramirez's face mask but it did not look like it cut the mask. The incident happened very quickly and Soto testified that it "[t]ook us all kind of by surprise."

Miguel Zarate also witnessed the incident. He testified through an interpreter that defendant and Ramirez started arguing and that, while he was not a fluent English speaker, it appeared it had something to do with Ramirez's water bucket. At some point, defendant pulled out a blade from his chest area and swung his arm toward Ramirez's face. Ramirez moved back a little bit when defendant swung at him. Zarate testified that he did not see the blade touch Ramirez's mask.

### 3. Defendant's Testimony

Defendant testified that he had worked for the vitamin manufacturer for around 90 days before the incident, initially as a temporary worker through a temporary employment agency and then as a permanent employee of the manufacturer. One of defendant's primary tasks was washing buckets at the wash station. Defendant testified that he regularly asked other employees to leave buckets that needed to be dumped at the wash station so as to not interfere with his work. The other employees never had a problem leaving buckets with defendant.

Defendant testified that on the night in question there had been a power outage before his shift, which resulted in an excessive number of buckets that he needed to wash. Defendant was washing buckets when Ramirez came in with a bucket and prepared to dump it. Defendant told Ramirez not to dump the bucket because defendant did not want the dirty water to contaminate the buckets he had already cleaned. Ramirez told him to "do your job, and I'll do my job." Defendant then pulled the bucket away from Ramirez

4

and set it to the side. Defendant testified that he and Ramirez were both arguing in raised voices.

Defendant testified that after arguing with Ramirez at the wash station for five or 10 minutes, defendant walked out to an open area in the building. Defendant hit his chest with his hand to tell Ramirez that he would take care of the bucket, not as an invitation to fight. Ramirez then reportedly told defendant to watch his back, which made defendant apprehensive. Defendant testified that he believed Ramirez's statement was a threat. Defendant testified that in response to Ramirez's statement, defendant pulled out his box cutter, "pulled the blade out, and I got in front of him. And I stopped and I looked him dead in his eye with my blade out and I told him I'm not the one you wanna play with. Straightforward." Defendant "waived the blade in his face" but testified that he was not trying to strike Ramirez with the blade. Defendant then put the box cutter away and watched Zarate and Nieto escort Ramirez out of the room.

On cross-examination, defendant testified that the box cutter came within three or four inches of Ramirez's face and also that it never came closer than a foot from Ramirez's face. Defendant acknowledged that he never saw Ramirez with a weapon that night.

To impeach defendant's credibility during cross-examination, the prosecutor introduced the application defendant had submitted to work for the vitamin manufacturer. The application contained an area to disclose any prior felony or serious misdemeanor convictions.[2] Defendant acknowledged that he left that section blank on the application, and that he had initialed a certification on the application that he was not withholding any information that might adversely affect his chances for employment. The prosecutor then read from an indictment in a Texas criminal prosecution of defendant: "Charge William Brown, Junior, who did then and there intentionally and knowingly cause bodily injury to

---

[2] A copy of that job application was admitted into evidence.

5

William Brown, Senior, an individual 65 years of age or older by striking William Brown, Senior, with hand." Defendant acknowledged that he had been convicted of elder abuse in that case in 2012 for conduct that occurred in 2011.[3] On re-direct examination, defendant testified that he had disclosed the Texas conviction on his initial application for temporary employment and that the vitamin manufacturer had access to that application.[4]

## B. VERDICT AND SENTENCING

The jury found defendant guilty of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)). Defense and prosecution waived jury on the special allegations about prior convictions. After a court trial, the court found defendant had previously suffered two felony convictions in 1998 arising from dousing his then-girlfriend and her daughter with gasoline: voluntary manslaughter of the girlfriend (§ 192, subd. (a)) and assault with force likely to produce great bodily injury of the daughter (former § 245, subd. (a)(1)).[5] Based on those convictions, the court found true special allegations that defendant had suffered one prior serious felony conviction (§ 667, subd. (a)(1)); one prior serious or violent felony strike conviction (§ 667, subds. (b)–(i)); one prior prison term (§ 667.5, subd. (b)); and prior felony convictions making defendant ineligible for probation in the current case. (§ 1203, subd. (e)(4)).

The trial court sentenced defendant to 12 years in prison, consisting of six years for the assault count (three-year middle term (§ 245, subd. (a)(1)), doubled for the prior strike (§ 667, subd. (e)(1))); five years for the prior serious felony manslaughter conviction (§ 667, subd. (a)(1)); and one year for the prior prison term related to the 1998 assault conviction (§ 667.5, subd. (b)).

---

[3] Defendant unsuccessfully moved to exclude evidence about the job application and the Texas conviction.

[4] No documentary evidence of the application to work for the temporary agency was introduced or admitted into evidence.

[5] Assault by force likely to produce great bodily injury is now located in section 245, subdivision (a)(4). (Stats. 2011, ch. 183, § 1, p. 2287.)

## II. DISCUSSION

### A. ELDER ABUSE CONVICTION

Defendant argues the trial court erred in allowing the prosecutor to impeach him by asking about his 2012 felony elder abuse conviction in Texas because it is not a crime of moral turpitude. (Citing *People v. Castro* (1985) 38 Cal.3d 301 (*Castro*).) As defendant's trial counsel did not raise that argument in the trial court, we review the issue as a claim of ineffective assistance of counsel.

To prevail on a claim of ineffective assistance, defendant must show both that his trial counsel's performance was deficient and that he was prejudiced by the deficiency. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216–217 (*Ledesma*).) To prove prejudice, defendant must affirmatively show a reasonable probability of a more favorable result had it not been for his trial counsel's error. (*Id.* at pp. 217–218.)

#### 1. Trial Court Ruling

After defense counsel indicated defendant would testify, the court discussed with all counsel outside the presence of the jury the admissibility of defendant's prior convictions for impeachment purposes. The trial court indicated it was inclined to admit the Texas conviction because it was "not remote in time" and "relates to assaultive behavior, which arguably is similar behavior to what we're dealing with in this case." The court further found that it was not significantly more prejudicial than probative, and that it would not be unduly time consuming. The court indicated it had reviewed *People v. Castro, supra*, 38 Cal.3d 301. Defense counsel did not argue that the Texas conviction was not a crime of moral turpitude.

#### 2. Admissibility of Felony Convictions for Impeachment

Article I, section 28, subdivision (f)(4) of the California Constitution states: "Any prior felony conviction of any person in any criminal proceeding, whether adult or juvenile, shall subsequently be used without limitation for purposes of impeachment or enhancement of sentence in any criminal proceeding." (See also Evid. Code, § 788

7

[generally, "[f]or the purpose of attacking the credibility of a witness, it may be shown by the examination of the witness or by the record of the judgment that he has been convicted of a felony"].) In *Castro,* the Supreme Court found that the foregoing constitutional provision is limited in two ways. First, trial courts retain discretion under Evidence Code section 352 to exclude an otherwise admissible prior felony conviction if its probative value is substantially outweighed by the danger of undue prejudice. (*Castro, supra,* 38 Cal.3d at pp. 310–313.) Second, the due process clause of the Fourteenth Amendment of the United States Constitution requires that "a witness' prior conviction should only be admissible for impeachment if the least adjudicated elements of the conviction necessarily involve moral turpitude." (*Id.* at pp. 314, 317.) The *Castro* court indicated that "it will be necessary to determine with respect to each felony conviction offered for impeachment—difficult though this may prove to be—whether it does or does not involve moral turpitude." (*Id.* at p. 316.)

Since *Castro,* courts have undertaken a felony-by-felony approach to determining whether specific felonies involve moral turpitude. Two cases are relevant here. In *People v. Sanders* (1992) 10 Cal.App.4th 1268 (*Sanders*), the court found that the least adjudicated elements of felony child endangerment (former § 273a, subd. (1)) did not involve moral turpitude because the felony could be committed by "passive conduct unaccompanied by criminal intent."[6] (*Sanders*, at p. 1274.) That subdivision imposed felony criminal liability upon "[a]ny person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of such child to be injured, or willfully causes or permits such child to be placed in such situation that its person or health is endangered ... ." (*Id.* at p. 1273.) The *Sanders* court stated that the

_____

[6] Section 273a, subdivision (1) was reorganized to its current location (§ 273a, subd. (a)) in 1994. (Stats. 1994, ch. 1263, § 3, p. 7936.)

8

least adjudicated elements of the child endangerment statute were: "(1) care or custody of a child by the defendant; (2) circumstances likely to produce great bodily harm or death; and (3) criminal negligence in permitting the child to be placed in a situation endangering the child's person or health." (*Id.* at pp. 1273–1274.) The court concluded that because that crime could be "violated by wholly passive conduct, free from any element of force, violence, threat, fraud, deceit, or stealth, ... we conclude that a conviction under the statute does not necessarily imply a general readiness to do evil or any moral depravity." (*Id.* at pp. 1274–1275.)

In *People v. Feaster* (2002) 102 Cal.App.4th 1084 (*Feaster*), the court determined that the least adjudicated elements of grossly negligently discharging a firearm (§ 246.3) involved moral turpitude because the felony involved a willful act. (*Feaster*, at p. 1093.) The court analyzed the statute and determined that its least adjudicated elements require that "(1) a person willfully and unlawfully discharged a firearm, (2) the person discharged the firearm in a grossly negligent manner, and (3) the person discharged the firearm in a manner that could result in injury or death to a person." (*Ibid.*) The *Feaster* court distinguished *Sanders* and other cases involving felonies proscribing passive conduct, reasoning that "an individual who discharges a firearm under circumstances that show an indifference to the consequences of his actions can be said to demonstrate moral turpitude." (*Feaster*, at p. 1093.)

### 3. The Texas Elder Abuse Statute At Issue Involves Moral Turpitude

Defendant argues that his conviction under Texas Penal Code section 22.04 did not involve moral turpitude. Texas Penal Code section 22.04 contains two different standards of felony liability based on the status of the person committing the felony. Texas Penal Code section 22.04, subdivision (a) broadly states: "A person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child, elderly individual, or disabled individual: [¶] (1) serious bodily injury; [¶] (2) serious mental deficiency,

9

impairment, or injury; or [¶] (3) bodily injury."  (Tex. Pen. Code, § 22.04, subd. (a).) Texas Penal Code section 22.04, subdivision (a-1) applies to a narrower category of individuals, stating:  "A person commits an offense if the person is an owner, operator, or employee of a group home, nursing facility, assisted living facility, intermediate care facility for persons with mental retardation, or other institutional care facility and the person intentionally, knowingly, recklessly, or with criminal negligence by omission causes to a child, elderly individual, or disabled individual who is a resident of that group home or facility: [¶] (1) serious bodily injury; [¶] (2) serious mental deficiency, impairment, or injury; or [¶] (3) bodily injury."  (Tex. Pen. Code, § 22.04, subd. (a-1).)

Defendant does not cite evidence in the record (and we have found none) specifying whether defendant was convicted under subdivision (a) or subdivision (a-1) of Texas Penal Code section 22.04.  Defendant quotes language from both subdivisions in his opening brief.  The distinction is relevant because, unlike the generally applicable subdivision (a) that prohibits injuries caused "recklessly by omission," subdivision (a-1) also prohibits injuries caused by owners and employees of institutional care facilities "with criminal negligence by omission."  There is no evidence in the record that defendant was "an owner, operator, or employee of a group home ... or other institutional care facility" (Tex. Pen. Code, § 22.04, subd. (a-1)) when he committed the felony.  And the prosecutor's summary of the offense in its sentencing brief indicated that the assault was against defendant's father and occurred at a house the victim owned.  On this record, we will therefore assume that defendant was convicted under subdivision (a).

Applying *Castro*'s least adjudicated elements test, a conviction under Texas Penal Code section 22.04, subdivision (a) requires that a person:  (1) causes a bodily injury to a child, elderly individual, or disabled individual; and (2) does so recklessly by omission. Recklessness for purposes of the Texas Penal Code is defined by Texas Penal Code section 6.03, subdivision (c):  "A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of

10

but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." Thus, an omission for purposes of Texas Penal Code section 22.04, subdivision (a) must be accompanied by a more volitional mental state than mere negligence. (See *Williams v. State* (Tex. 2007) 235 S.W.3d 742, 757 [reversing Tex. Pen. Code, § 22.04, subd. (a) conviction; finding mother's act of leaving children under her boyfriend's care in a room with a lit candle "does not involve a 'substantial and unjustifiable' risk of serious bodily injury or death" and was thus legally insufficient to show mother "consciously disregarded a substantial or unjustifiable risk that her children would suffer serious bodily injury in a house fire"].) Although defendant argues that the statute "may be violated by criminal negligence or omission alone," that argument is based on Texas Penal Code section 22.04, subdivision (a-1), which is not applicable here because there was no evidence that defendant was an owner or employee of a group home or other institutional care facility when he assaulted his father.

Because the least adjudicated elements of Texas Penal Code section 22.04, subdivision (a) require a showing that a defendant is aware of, and consciously disregards, a substantial or unjustifiable risk that the victim will be injured, we conclude that a violation of that subdivision involves moral turpitude. That more volitional mental state distinguishes the Texas felony from felonies like the one at issue in *Sanders* that could be violated by passive conduct and mere negligence. (*Sanders, supra,* 10 Cal.App.4th at p. 1274.) As the Texas conviction was proper impeachment evidence, defense counsel was not deficient in failing to object.

### 4. The Texas Conviction Was Not Admitted Under Evidence Code Section 1101

Defendant argues that the 2012 Texas conviction was inadmissible as Evidence Code section 1101 evidence and notes that the trial court never resolved the prosecutor's motion in limine to admit the conviction for that purpose. But the prosecutor did not

11

ultimately offer the 2012 Texas conviction as evidence of a prior crime to prove motive, intent, or any of the other characteristics listed in Evidence Code section 1101, subdivision (b). The prosecutor introduced the evidence solely to impeach defendant's credibility after defendant chose to testify. Because the prosecutor did not use the 2012 Texas conviction as Evidence Code section 1101 character evidence, the trial court did not err in not resolving that issue.

### B. JOB APPLICATION EVIDENCE

Defendant argues that the trial court abused its discretion by failing to weigh the factors in Evidence Code section 352 before allowing the prosecutor to impeach him with evidence that he omitted information about prior convictions from his job application. To the extent the argument was not preserved, defendant alternatively contends that his trial counsel provided ineffective assistance.

#### 1. Trial Court Ruling

Before trial, defense counsel moved in limine "to exclude any prior convictions should he testify in this trial," based on Evidence Code section 352. When defense counsel indicated to the court during trial that defendant would testify, the court and attorneys discussed the admissibility of defendant's prior convictions. The court considered defendant's prior convictions under Evidence Code section 352, finding that the 2012 Texas elder abuse conviction was admissible because it was not remote in time and involved "assaultive behavior, which arguably is similar behavior to what we're dealing with in this case." The trial court found that defendant's 1998 voluntary manslaughter conviction was inadmissible because it was too temporally remote and had a potential to confuse the jury.

After ruling on the Evidence Code section 352 motion regarding defendant's prior convictions, the trial court prepared to bring the jury back into the courtroom when the prosecutor interjected that he had "one other thing that came up actually last Friday." The prosecutor had been informed just before trial that there might be false information

12

on defendant's application to work at the vitamin manufacturer. The prosecutor had obtained a copy of the application and had provided a copy to defense counsel before trial. The application asked whether defendant had ever been convicted of a felony or serious misdemeanor and defendant had left that question blank. Defendant had also certified on the application that he had not knowingly withheld any information.

The prosecutor argued the application was admissible to impeach defendant's character for truthfulness because it showed he had been dishonest on the application. Defense counsel argued that leaving the question blank was "certainly an omission" but was "not a lie" because he did not affirmatively deny having suffered any prior convictions. Defense counsel also stated that defendant had disclosed his prior convictions in the application he completed for the temporary agency that originally placed defendant at the vitamin manufacturer. Defense counsel did not have a copy of that original application. Defense counsel did not object under Evidence Code section 352 to admission of the job application evidence. The trial court found the job application evidence admissible for impeachment, reasoning that the application suggested defendant "was not credible, was not accurate, was not honest."

### 2. Evidence Code Section 352 Argument Was Not Preserved

On appeal, defendant argues that his motion in limine to exclude prior convictions based on Evidence Code section 352 extended to a job application. But while defendant's omission on the job application concerned his prior convictions, the job application evidence itself was not a prior conviction. Though defendant argues on appeal that the trial court "completely failed to weigh the factors under Evidence Code [section] 352 in deciding whether to allow the prior conviction evidence to come in relative to the job application," the trial court had already weighed the convictions' admissibility under Evidence Code section 352. Any lack of further Evidence Code section 352 analysis about the job application was due to defense counsel's failure to object to the evidence on that basis.

13

We will therefore review whether defendant's trial counsel was ineffective for failing to make an Evidence Code section 352 objection to the job application impeachment evidence. (*Ledesma, supra,* 43 Cal.3d at pp. 216–218.)

### 3. Trial Counsel Was Not Ineffective

Article I, section 28, subdivision (f)(2) of the California Constitution provides that "relevant evidence shall not be excluded in any criminal proceeding," subject to certain exceptions including determination under Evidence Code section 352 that the evidence is substantially more prejudicial than probative. That provision effectively made Evidence Code section 787 inapplicable in criminal cases. (*People v. Harris* (1989) 47 Cal.3d 1047, 1081; Evid. Code, § 787 ["evidence of specific instances of his conduct relevant only as tending to prove a trait of his character is inadmissible to attack or support the credibility of a witness"].)

Defendant's trial counsel essentially argued that the job application evidence was not relevant to prove defendant's character for truthfulness because it was an omission rather than an affirmative misrepresentation and because defendant had disclosed his prior convictions on his application for temporary employment.

On appeal, defendant repeats his trial counsel's arguments and contends that they demonstrate that the job application evidence was substantially more prejudicial than probative. Defendant argues his representations and omissions on the vitamin manufacturer job application "did not have any probative value whatsoever" for two reasons. First, defendant argues that he did not affirmatively misrepresent his criminal history because "he merely left blank the 'yes' or 'no' responses to the question concerning any past criminal offense." But the job application evidence supported an inference that defendant was being dishonest by leaving that question blank and then certifying that he had not withheld any information. Second, defendant argues that he did not actually withhold information because, according to his trial testimony, he had disclosed his prior convictions on the temporary employment application and the vitamin

14

manufacturer possessed that original application. Contrary to defendant's argument, his testimony about accurately disclosing his prior convictions on an application to work for a temporary employment agency does not automatically destroy the probative value of his failure to disclose his prior convictions when applying to work directly for the vitamin manufacturer. Notably, the only application introduced and admitted into evidence was defendant's vitamin manufacturer application containing the omission. At most, defendant's testimony created a factual dispute for the jury to resolve. The documentary evidence thus had significant probative value regarding defendant's character for truthfulness.

As for potential prejudice, defendant argues that the job application evidence was prejudicial because it allowed the jury to hear about defendant's prior conviction for assaultive conduct. But the trial court had already evaluated the prior convictions under Evidence Code section 352 and found as to the 2012 Texas conviction that its temporal proximity and similarity to the charged conduct was not substantially outweighed by its potential prejudicial effect. As for defendant's character for truthfulness more generally, the trial court allowed defendant's trial counsel to elicit testimony from defendant that he had disclosed his prior convictions on the temporary worker application.

Even if counsel had objected under Evidence Code section 352, the trial court could have reasonably concluded, in the exercise of its broad discretion, that the application "had significant probative value and would not so inflame the jurors' emotions as to interfere with their fair and dispassionate assessment of the evidence of defendant's guilt." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1126–1127.) As such, defendant has not shown that he was prejudiced by his trial counsel's failure to object under Evidence Code section 352.

## C. SENTENCE ENHANCEMENTS

Defendant argues, and the People concede, that the trial court erred by imposing both a five-year prior serious felony enhancement (§ 667, subd. (a)(1)) and a one-year

prior prison term enhancement (§ 667.5, subd. (b)) based on defendant's 1998 convictions for voluntary manslaughter and assault by force likely to produce great bodily injury, respectively, because those convictions were based on the same facts and charged in the same case. (Cf. *People v. Jones* (1993) 5 Cal.4th 1142, 1144–1145, 1149–1150 [finding sentence may not be enhanced "both for a prior conviction and for a prison term imposed for that conviction"].) We accept the People's concession and will modify the judgment to strike the one-year prior prison term enhancement.

## III.    DISPOSITION

The judgment is modified to strike the one-year Penal Code section 667.5, subdivision (b) prior prison term enhancement. As so modified, the judgment is affirmed.

_____

Grover, J.

**WE CONCUR:**

_____

Rushing, P.J.

_____

Premo, J.

*People v Brown*
H040734